OPINION
{¶ 1} Appellant, Rhonda Collins, appeals a judgment of the Franklin County Court of Common Pleas which affirmed an order of appellee, the Ohio State Racing Commission ("Commission"), finding she failed to give her best effort in a race, and for conduct detrimental to the sport of horse racing.
 {¶ 2} Appellant is a jockey licensed to race horses in the state of Ohio. In August 2001, appellant was assigned to ride Buckeye Star, a two-year-old filly, in the horse's first, or "maiden," race at River Downs racetrack near Cincinnati. Buckeye Star was in the 11th posting position, meaning that, in order to have a shorter, faster run she would have to cross over to the inside lane during the course of the race. For the first part of the race, she was toward the rear, but eventually appellant was able to ride the horse to the front of the pack, securing a second place finish.
 {¶ 3} During each horse race, three stewards, who are employed by the Commission, are assigned the duty of observing the race both live and on video. None of the stewards noted anything amiss about appellant's performance during the race. After the race, an anonymous person phoned the stewards and alleged that appellant had held back while riding Buckeye Star. Upon receipt of this complaint, the stewards reviewed the video recordings of the race which showed both a pan and a head-on view of the participants. After watching the video 20 times or more, the stewards concluded that appellant held back at the head of the stretch and stopped pushing to win, that she was not whipping the horse, and that there was no fluid motion of her arms. The next day, they called appellant into their office and confronted her with their conclusion that appellant had not given her best effort, a charge which, if proven, is grounds for disciplinary action.
 {¶ 4} Appellant explained to the stewards that, at the 16th
pole, she felt the saddle slip to the side, and that from that point on her goal was to keep her balance and finish the race without causing injury to herself or others. She said that Buckeye Star had been "lugging in," meaning that the horse was bearing to the inside rail. She explained that she had not whipped the horse more aggressively both because it was Buckeye Star's maiden race and because she was concentrating on keeping her mount because of the slipping saddle.
 {¶ 5} The stewards did not accept appellant's explanation and suspended appellant's license for 30 days for failure to use her utmost exertion to obtain a winning performance and for conduct detrimental to the sport of horse racing. Appellant appealed this decision to the Commission, and a hearing examiner conducted a hearing in March 2002.
 {¶ 6} At the hearing, two of the three stewards testified regarding what had led them to believe appellant had not given her best effort. According to steward Phillip Gore, the video tape showed no sign that the horse was "running green" or "lugging in" in the final stretch, nor that the saddle was slipping. (Tr. at 29.) He explained that, if the saddle was slipping, appellant should have thrown her feet out of the stirrups and given up any chance of winning the race. Gore indicated his belief that appellant had deliberately tried not to win because Buckeye Star was slated to run in a race with a larger purse at Hoosier Park in Indiana a few weeks later, and that she would not qualify for the maiden race there if she won at River Downs. Another steward, Mike Manganello, testified that he thought it appeared appellant was making it look like she was whipping the horse but that the whip did not make contact. Manganello stated he believed appellant "didn't give 100 percent * * * since the horse just got beat by a nose, just [a] little more effort * * * may have made the horse win." (Tr. at 109.) He also stated that, if the horse was lugging in, appellant should have been hitting the horse with her left hand, not her right, and that when appellant clearly appeared to be tilting in the saddle just past the wire she was attempting to make it look like the saddle was slipping. The third steward did not appear at the hearing, but a stipulation was filed that, if given, his testimony would have reflected that of Gore and Manganello.
 {¶ 7} The horse's trainer, John Bourke, testified that prior to the race he had instructed appellant that he did not want the horse ridden too aggressively since it was her first race, and also that the horse had shin problems, which are common in a horse that age but which usually do not prevent the horse from racing. At the hearing before the Commission's hearing examiner, Bourke testified that, although the horse was entered in the race for the purpose of winning, because of her shin problems he had been doubtful that the horse would win. He stated that horses in their maiden race should not be whipped too aggressively because of the danger of their becoming reluctant to race if the experience is too frightening for them. Bourke also stated that, if the saddle is slipping it is not possible for the jockey to ride aggressively because, if the horse is at the front of the pack and the saddle turns sideways, the jockey could be dislodged from the horse and trampled by oncoming traffic. He stated that, if the saddle is slipping, it would be "suicidal" for the jockey to whip the horse, and throwing feet out of the irons was not an option in this instance because appellant was at the front of the pack and too close to the finish line to pull up and get out of the race without endangering herself and the other horses and jockeys. (Tr. at 180-183.)
 {¶ 8} By her testimony, appellant explained that she had been a jockey since 1993, and that her chosen career requires a great deal of training and hard work. She explained that being a jockey is a dangerous profession because jockeys are so light, and because horses are so heavy — most weigh between 800 and 1,200 pounds — and can run from 30 to 35 miles per hour. She said she has sustained numerous injuries, several of them serious, and that she had lost a best friend to the sport. She explained that jockeys typically make only about $40 each time they ride in a race, unless they win, in which case they make 10 percent of the owner's take and then must use a percentage of their earnings to compensate valets and agents. She stated that even the best jockeys only win about 15 to 20 percent of the time, and that her win rate is around 7 or 8 percent. She stated there is a "snowball" effect to winning — the more races a jockey wins, the more promising the mounts they are given to ride; thus, there is a strong incentive for jockeys to try to win races. (Tr. at 219.)
 {¶ 9} During appellant's testimony, she narrated the video of the race. Appellant stated that, at the top of the stretch:
As I'm coming around here to angle out, I'm right behind there and my saddle is fine now. As I come out she slides — right there is when the saddle first slips. I'm trying to get myself together. I grab main [sic] to try to balance myself. I'm trying to push weight over to the right side. I can't exactly explain how I was trying to do it. I was just trying to compensate and make my body stiff and at the same time try to ride her.
* * * I was just trying to do what I could do and she kept lugging in and as we got to the other horse, she straightened up some because the rail was no longer there. They are trained to work fast on the rail. When she straightened up — I just tried too hard at the wire pushing that that's when my saddle really slipped right at the wire and it was a consequence of trying right at the end.
(Tr. at 236-237.)
 {¶ 10} Asked whether there was anything she could have done other than try to win the race and be safe in riding, appellant responded that the only other thing she could have done was "pull her up," meaning to rein in the horse and drop out of the race. (Tr. at 238.) Asked by the hearing examiner how appellant would identify the point in the race where the saddle first started slipping, appellant stated:
Well, when I was coming around the turn, I didn't feel anything. I was just starting to angle her out. You never know why a saddle slips. It could be how they were saddled. If the horse breaths [sic] out excessively and the girths didn't get tight enough.
As I angled her out, the horse is coming out is the only thing I can think of that would have caused it. As I came out and my weight was like this is when I first felt it tilt. Saddles can slip back. They can slip forward and stay straight up right. But if it goes this way or that way, I can't kicked [sic] my feet out of the irons. If I had done that — trying to shift your weight out of either one when it was already off balance, would have caused a catastrophe.
(Tr. at 238-239.)
 {¶ 11} Appellant testified that she just kept feeling the saddle was going to "go all the way," and that when she finally did try to "even hand ride" the saddle went the rest of the way to the side, which occurred just past the wire. (Tr. at 240.) In addition, she explained that, when it looked like she was pretending to whip the horse, she was actually "flagging" the horse with the whip, an accepted practice which gets the horse's attention and coaxes a better performance without actually having to hit the horse. Asked on cross-examination whether her explanation for not whipping the horse at the stretch was that her trainer had told her not to or that the saddle was slipping, appellant stated that, if her saddle had been in proper place, she would have hit the horse a few more times.
 {¶ 12} In her report and recommendation, the hearing examiner stated:
Conflicting evidence was presented regarding the actions of Rhonda Collins on August 21, 2001. Ms. Collins was a credible witness, and she believes she rode BUCKEYE STAR appropriately given the conditions with which she had to contend. However, the Stewards were also highly credible witnesses. The Ohio State Racing Commission has a duty to interpret its rules, and its interpretation is given great weight. Pursuant to the Commission's rules, the stewards are responsible for watching each race and determining if any violations of the administrative rules have taken place. They viewed the live race at issue in this case and also reviewed the videotape of the race numerous times before reaching their conclusion. Stewards are given discretion in rendering their decisions.
 {¶ 13} The hearing examiner concluded that the Commission proved by a preponderance of the evidence that appellant failed to use her utmost exertion to obtain a winning performance, and that the stewards had acted properly in issuing a 30-day license suspension; however, the hearing examiner did not find that the Commission proved by a preponderance of the evidence that appellant had engaged in conduct detrimental to the sport of horse racing. The examiner recommended that the ruling of the stewards be affirmed that appellant receive a 30-day suspension, with costs of the hearing to be assessed against appellant.
 {¶ 14} The matter came before the Commission in September 2002. In its finding and order, the Commission adopted the hearing examiner's report and recommendation; however, the Commission modified it to find that there is a preponderance of evidence to reflect that appellant also engaged in conduct detrimental to the sport of horse racing, and ordered that appellant receive a 60-day suspension and be assessed a $1,000 fine in addition to paying the costs of the adjudication of her case.
 {¶ 15} Appellant appealed this decision to the Franklin County Court of Common Pleas, which addressed appellant's argument that the hearing examiner improperly found the evidence on each side to be equally credible but nevertheless ruled in favor of the Commission. The court stated:
The hearing officer did not find that the evidence was equally balanced. Rather, the hearing officer merely noted that there was conflicting evidence and that both Collins and the Stewards were credible. The hearing officer went on to find that it had been proven by a preponderance of the evidence that Ms. Collins failed to use her utmost exertion to obtain a winning performance during the August 21, 2001 race. The hearing officer's finding necessarily means that she concluded the evidence was not equally balanced, and that the Commission had proven the rule violation.
 {¶ 16} Appellant now assigns the following as error:
ASSIGNMENT OF ERROR NO. I:
THE TRIAL COURT AND THE ADMINISTRATIVE AGENCY ERRED AS A MATTER OF LAW IN UPHOLDING THE SUSPENSION OF APPELLANT'S JOCKEY LICENSE WHEN THE HEARING OFFICER FOUND THE EVIDENCE IN THE CASE TO BE CONFLICTING, BUT FURTHER FOUND THE APPELLANT TO BE CREDIBLE.
ASSIGNMENT OF ERROR NO. II:
THE TRIAL COURT'S DECISION SUSPENDING APPELLANT'S LICENSE IS NOT SUPPORTED BY SUBSTANTIAL, RELIABLE, PROBATIVE EVIDENCE.
ASSIGNMENT OF ERROR NO. III:
THE TRIAL COURT ERRED IN AFFIRMING THE COMMISSION'S DECISION WHICH REJECTED THE HEARING OFFICER'S RECOMMENDATION BY DOUBLING APPELLANT'S FINE AND IN FINDING THAT APPELLANT VIOLATED O.A.C. § 3769-4-26(C).
ASSIGNMENT OF ERROR NO. IV:
THE TRIAL COURT'S DECISION AFFIRMING THE COMMISSION'S ORDER SUSPENDING APPELLANT'S LICENSE WAS ARBITRARY AND CAPRICIOUS.
ASSIGNMENT OF ERROR NO. V:
O.A.C. § 3769-4-26(C) PROHIBITING ANY CONDUCT "GENERALLY FOUND UNACCEPTABLE TO THE STEWARDS" IS UNCONSTITUTUIONALLY [SIC] VAGUE AND OVERLY BROAD.
 {¶ 17} Appellant's first four assignments of error are related and will be discussed together.
 {¶ 18} Ohio Adm. Code 3769-6-48 states:
Every horse shall be ridden out unless injured. Any jockey who, without adequate cause, shall rein in before crossing the finish line or who shall fail to use his/her utmost exertion to obtain a winning performance from the horse ridden by him/her may be suspended, ruled off, or may be subject to such other penalty as the stewards or commission may impose.
 {¶ 19} Ohio Adm. Code 3769-4-26(C) states:
The stewards may take disciplinary action against any licensee who has conducted himself/herself in a manner detrimental to the sport of horse racing by the indiscriminate use of profanity, failure to properly perform their duties which directly affect the track patrons, the treatment of patrons or other persons on the track premises in a discourteous manner, or by other actions which are found to be generally unacceptable by patrons and/or the stewards.
 {¶ 20} In an administrative appeal, pursuant to R.C. 119.12, the trial court reviews an agency's order to determine whether the order is supported by reliable, probative and substantial evidence and is in accordance with law. In performing this review, the court of common pleas may consider the credibility of the witnesses as well as the weight and probative character of the evidence. To a limited extent, the standard of review permits the court of common pleas to substitute its judgment for that of the administrative agency; however, the court of common pleas must give due deference to the administrative resolution of evidentiary conflicts. Univ. of Cincinnati v. Conrad (1980), 63 Ohio St.2d 108.
 {¶ 21} On appeal to this court, the standard of review is more limited. Unlike the court of common pleas, the court of appeals does not determine the weight of the evidence. In reviewing the decision of the court of common pleas, as to whether an agency's order is or is not supported by reliable, probative and substantial evidence, an appellate court's role is limited to determining whether or not the court of common pleas abused its discretion. Hartzog v. Ohio State Univ. (1985),27 Ohio App.3d 214. An abuse of discretion implies the decision is both without a reasonable basis and is clearly wrong. Angelkovski v. BuckeyePotato Chips Co. (1983), 11 Ohio App.3d 159. This standard of review is limited to issues such as the weight of the evidence and credibility of the witnesses as to which the court of common pleas has some limited discretion to exercise. On questions of law, the court of common pleas does not exercise discretion and the court of appeals' review is plenary. Univ. Hosp., Univ. of Cincinnati College of Medicine v. StateEmp. Relations Bd. (1992), 63 Ohio St.3d 339.
 {¶ 22} Although this court generally defers to the experts at the agency level, this court has stated:
There would be no point in having various tiers of review in administrative cases if the only duty of each reviewing body were to approve without question the decision which came before. Nor would there be any point in allowing each reviewing body to make a decision completely independent of any preceding findings and conclusions. Instead, the system envisions a series of checks and balances in which each reviewing body considers what has gone before with an eye for the reasonability of the prior decision based upon all the facts presented and in light of the statutory requirements and factors. This court is charged with reviewing whether the trial court abused its discretion, which requires us to consider whether the trial court decision was based on reliable, probative and substantial evidence and was in accordance with law. The trial court in turn had to consider whether the Board decision was based on reliable, probative and substantial evidence and was in accordance with law. The Board, while empowered to reject the conclusions of its hearing officer, was charged with doing so only on grounds which are legally sufficient to overcome uncontradicted evidence in support of the hearing officer's recommendation. * * *
(Emphasis sic.) Residents of Baldwin Rd. v. Ohio Dept. of Edn.,
Franklin App. No. 02AP-257, 2002-Ohio-5522.
 {¶ 23} Moreover, "[t]he key term is `preponderance.' If a preponderance of reliable, probative and substantial evidence exists, the Court of Common Pleas must affirm the agency decision; if it does not exist, the court may reverse, vacate, modify or remand" Dudukovich v.Housing Auth. (1979), 58 Ohio St.2d 202, 207.
 {¶ 24} Appellant argues that the trial court's affirmance of appellant's suspension was an abuse of discretion because the Commission did not prove by a preponderance of the evidence that appellant committed the violations with which she was charged. Appellant points to the hearing examiner's statements that both sides of this case presented credible testimony, urging that this was an admission the facts were in equipoise and a negation that the Commission's decision was based upon a preponderance of reliable, probative and substantial evidence.
 {¶ 25} We agree. A party having the burden of proof must produce evidence furnishing a reasonable basis for sustaining his claim, and, if the evidence only suggests a choice among different possibilities, the burden of proof has not been met. See, e.g., Stevens v. Indus. Comm.
(1945), 145 Ohio St. 198; Kata v. Second Natl. Bank (1971),26 Ohio St.2d 210; Dalton v. Abbott (Mar. 20, 1990), Franklin App. No. 89AP-1310.
 {¶ 26} With all of the evidence in mind, the hearing examiner found that both sides had presented credible testimony, but the examiner never weighed the evidence to determine which side's evidence was more reliable, probative or substantial. Thus, the resulting decision from the Commission was not an administrative resolution of evidentiary conflicts, but a matter of all things being equal, it will defer to the stewards' expertise. Thus, the hearing examiner did not engage in the requisite weighing of the facts, and the Commission's order was not supported by a preponderance of reliable, probative and substantial evidence. The trial court abused its discretion in so finding, and we sustain appellant's first, second, third and fourth assignments of error.
 {¶ 27} Given our disposition of appellant's assignments of error one through four, appellant's fifth assignment of error is overruled as moot.
 {¶ 28} Appellant's first, second, third and fourth assignments of error are sustained, appellant's fifth assignment of error is overruled as moot, and the judgment of the Franklin County Court of Common Pleas is reversed and this matter is remanded to that court with instructions to enter judgment in favor of appellant.
Judgment reversed and remanded with instructions.
LAZARUS and WATSON, JJ., concur.